
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_(signature)_

**Signed August 24, 2006**

_____
**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| NORTHWEST TIMBERLINE | § | CASE NO. 04-36426-SGJ-11 |
| ENTERPRISES, INC., | § | |
| | § | |
| D E B T O R. | § | |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CONSTRUCTION AND REAL ESTATE | § | CASE NO. 04-36448-SGJ-11 |
| INFORMATION SERVICES, INC., | § | |
| | § | |
| D E B T O R. | § | |

## <u>MEMORANDUM OPINION GRANTING MOTIONS OF CHEVRON U.S.A. INC. FOR RELIEF FROM THE AUTOMATIC STAY</u>

CAME ON FOR CONSIDERATION by this court, on May 22 and 30, 2006, the Motions of Chevron U.S.A. Inc. for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1) and (d)(2) and Motions to Convert Cases to Chapter 7 by Chevron U.S.A. Inc. filed in each of the two above-referenced cases. Desiring to

enter detailed written reasons for justifying its decision, and given that there was an approximately two-year history involving these debtors under two previous bankruptcy judges before this judge was reassigned these cases, of which the court believed it should take judicial notice and give due and fair consideration, the court took the matters under advisement. Having carefully considered the arguments of counsel, testimony of witnesses, the evidence adduced, the two-year history of these cases, and the applicable law, the court now enters this memorandum opinion.

## JURISDICTION

This court has jurisdiction over these matters under 28 U.S.C. §§ 157(b)(2)(G) and (L) and 1334. This memorandum opinion encompasses the court's findings of facts and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. Where appropriate, a finding of fact shall be construed as a conclusion of law and vice versa. The court reserves the right to make further findings of fact and conclusions of law.

## FINDINGS OF FACT

**A.  The Early History of these Cases.**

1.   These cases, *In re Northwest Timberline Enterprises Inc.* ("NWTE"), case no. 04-36426, and *In re Construction and Real Estate Information Services, Inc.* ("CREIS"), case no. 04-36448 (collectively referred to as the "Debtors"), are affiliated, but not consolidated, cases. Each Debtor owns and operates separate

-2-

gas stations and convenience stores. NWTE's operations are located at 3311 West Northwest Highway, Dallas, Texas, and CREIS' operations are located at 8817 Clark Road, Dallas, Texas.

2. Saeed Mahboubi is the common connection to the two Debtors that makes them "affiliated" Debtors. Mr. Mahboubi is the president and 70% shareholder of NWTE and is also the president and 70% shareholder of CREIS.[1]

3. As referenced above, the NWTE and CREIS cases are more than two years old. NWTE was filed under Chapter 11 on June 8, 2004, and CREIS was filed under Chapter 11 on June 9, 2004.

4. NWTE and CREIS have each essentially been two-party disputes between the respective Debtors and their under-secured lender, Chevron U.S.A. Inc. ("Chevron"). Chevron is both the secured lender (secured by virtually all the Debtors' assets) and the largest unsecured creditor in each case (by virtue of having large unsecured deficiency claims in each case).

5. Chevron claims to be owed $1,557,197.46 by NWTE [*see* Proof of Claim # 10 in the NWTE case] and $1,507,219.19 by CREIS [*see* Proof of Claim # 9 in the CREIS case] in connection with

---

[1] *See* 11 U.S.C. § 101(2)(B) (definition of "affiliate"). The court notes that these cases, since filed well prior to October 17, 2005, are governed by the Bankruptcy Code as it existed before the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Therefore, all references to the Bankruptcy Code herein shall refer to the pre-BAPCPA Bankruptcy Code.

separate loans to each Debtor.[2]  According to Chevron, Chevron
and the Debtors have stipulated that the value of Chevron's
collateral in each case (and, thus, the amount of the secured
claims of Chevron in each case) is $1.1 million less unpaid ad
valorem taxes.[3]  The Debtors assert in their post-trial
memorandum, filed on June 5, 2006, that "the debtors stipulated
that Chevron held a secured claim equal to $1.1 million less
taxes *and* other secured indebtedness."[4]  The Debtors' most recent

---

[2]These claims are deemed allowed at this juncture since
neither claim is the subject of any objection.  *See* 11 U.S.C.
§ 502(a).

[3]The court admitted into evidence two uncontroverted real
estate appraisals introduced by Chevron: (a) a real estate
appraisal report on the NTWE property dated November 14, 2004,
prepared by Crosson Dannis, Inc., concluding that the NWTE real
property and improvements had a value of $1,180,000; and (b) a
real estate appraisal report on the CREIS property dated November
12, 2004, prepared by Crosson Dannis, Inc., concluding that the
CREIS real property and improvements had a value of $1,100,000.
*See* Chevron's Trial Exhibits 5 and 6.

[4]It was not apparent from the evidence what other "secured
indebtedness" might genuinely exist in these cases, other than
that owed to Chevron and the taxing authorities (the latter of
which is discussed herein in further detail).  However, the court
takes judicial notice of the claims register in these cases
showing that Citicorp Leasing, Inc. ("Citicorp"), apparently also
sometimes referred to as Balboa Capital Leasing (and possibly
either a successor or predecessor in interest to Balboa Capital
Leasing), has a pending secured claim of a mere $4,000 in the
NWTE case [Proof of Claim # 17, amending Proof of Claim # 11]
relating to some equipment it represents was leased to a non-
Debtor entity named Flash Mart Stores, Inc. and which is in
NWTE's "possession."  Though the Debtor apparently does not
contest this Citicorp claim, it is unclear from the record why
NWTE is liable for a non-Debtor entity's obligations.  In any
event, this is only a claim of $4,000 and is only against NWTE,
not CREIS.  The only other secured claim filed of record in

-4-

plan modification provides that the Chevron allowed secured claim against each Debtor will be set under the plan as "$940,000 less payments made during the case." In any event, it appears from the evidence and representations that it is undisputed that Chevron's bifurcated secured claim, pursuant to Section 506(a) of the Bankruptcy Code, is $940,000 (or perhaps slightly less) in each case, and its unsecured deficiency claim, pursuant to Section 506(a) of the Bankruptcy Code, is approximately $600,000 (or perhaps slightly more) in each case.

6. The only other significant, interested creditors in these cases are the Dallas County taxing authorities which are owed ad valorem and real estate taxes for the years 2001-2006, totaling approximately $322,000 in the aggregate against both Debtors. The court finds it extremely significant that these Debtors are five years behind on paying their ad valorem and real estate taxes—a fact that will be further addressed later in this opinion.

7. An unsecured creditors committee was never formed in

---

either of the cases (besides those proofs of claim of Chevron and the taxing authorities) is another Citicorp secured proof of claim [Proof of Claim # 8 filed in the CREIS case] which was wholly duplicative of Chevron's Proof of Claim in the same case (this is because Citicorp was the original lender on the indebtedness CREIS owes to Chevron and Chevron satisfied Citicorp in respect of this debt).

either of these cases.   There are very few unsecured creditors.[5]

8.    The Debtors have been pursuing a joint plan in their cases since December 27, 2004, when a first plan in each case was filed.   A first amended plan was filed on March 8, 2005, and a second amended plan was filed on May 2, 2005.   A plan supplement to the second amended plan was filed on May 9, 2005.   A second plan supplement to the second amended plan was filed November 20, 2005.   Then, a modification to the second amended plan was filed

---

[5] In the NWTE case, the general unsecured claims, totaling $42,999.52, excluding Chevron, belong to the following creditors: (1) Grant Sales, Inc., (2) Dr. Pepper Bottling Co. of Texas, (3) City of Dallas Water Utilities, (4) TXU Energy Retail Company LP, (5) Frito-Lay, Inc., (6) ADT Security Services, (7) Zep Manufacturing, (8) CitiCorp. Leasing, Inc., and (9) SBC Southwest.   Citicorp Leasing, Inc. (for its alleged $19,930.60 unsecured deficiency claim relating to the equipment it leased to non-Debtor Flash Mart Stores, Inc., of which NWTE apparently has possession and has decided to accept liability) is the only general unsecured creditor, aside from Chevron, owed more than $10,000.   To put this unsecured creditor pool in perspective, assuming Chevron has a $600,000 unsecured deficiency claim in the NWTE case, it holds 93.4% of the unsecured claim pool in the NWTE case ($600,000 divided by $642,999.52) and is one of only two creditors holding a claim of more than $10,000 (assuming the genuineness of Citicorp's $19,930.60 claim against NWTE).

In the CREIS case, the general unsecured claims, totaling $64,479.04, excluding Chevron, belong to the following creditors: (1) Grant Sales, Inc., (2) JFG Concrete, Inc., (3) TXU Energy Retail Company LP, (4) Frito-Lay Inc., and (5) Internal Revenue Service.   JFG Concrete, Inc. (which filed a proof of claim for $47,574) is the only general unsecured creditor, aside from Chevron, owed more than $10,000.   To put this unsecured creditor pool in perspective, assuming Chevron has a $600,000 unsecured deficiency claim in the CREIS case, it holds 90.3% of the unsecured claim pool in the CREIS case ($600,000 divided by $664,479.04) and is one of only two creditors holding a claim of more than $10,000.

on May 19, 2006 (collectively, for ease of reference, the second amended plan and the supplements and modification thereto will be referred to as the "Current Joint Plan"). As of this date, neither Chevron nor the taxing authorities support the Current Joint Plan.

9. On January 21, 2005, Chevron filed Motions of Chevron U.S.A. Inc. for Relief from Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1) and (d)(2) in each of the bankruptcy cases (hereinafter "Motions to Lift Stay") [Docket Entry #73 in the NWTE case and Docket Entry #65 in the CREIS case], and on April 15, 2005, Chevron filed Motions to Convert Case to Chapter 7 (hereinafter "Motions to Convert") in each of the bankruptcy cases [Docket Entry #93 in the NWTE case and Docket Entry #85 in the CREIS case].

**B. Case History Since Chevron's First Pursuit (in early 2005) of its Motions to Lift Stay and Motions to Convert: The Sale Efforts and Appointment of a Chapter 11 Trustee.**

10. Looking back at the events that transpired after the filing of the Motions to Lift Stay and the Motions to Convert, on May 23, 2005, the court entered an order, in each case, granting the Debtors' Emergency Application to Establish Sale Procedures for Sale of Equity Interests in the Reorganized Debtor as Called for by Debtor's First Amended Plan of Reorganization and to Take Higher and Better Offers [Docket Entry #110 in the NWTE case and Docket Entry #101 in the CREIS case].

11.  Then, on June 24, 2005, Judge Steven A. Felsenthal, after hearing testimony and argument, decided that a Chapter 11 trustee might be the most reasonable solution "to explore a more businesslike resolution of these cases."  He signed an order authorizing the appointment of a Chapter 11 Trustee on June 27, 2005.  [Docket Entry #131 in the NWTE case and Docket Entry #124 in the CREIS case.]  Subsequently, Mr. Robert Yaquinto was appointed as the Chapter 11 trustee in each case (the "Chapter 11 Trustee").  The order appointing Mr. Yaquinto was not a broadly worded order including authority for Chapter 11 Trustee to conduct investigations of fraud, misconduct or anything of a similar nature.  The Chapter 11 Trustee was apparently simply charged with helping to find a businesslike resolution for these cases.  There is nothing in the record suggesting he was given full scale authority to take over the operations of the business and remove management from any exercise of control over the business.

12.  Unfortunately, more than one year later, no "businesslike resolution" seems to have materialized in the cases.

13.  On October 20, 2005, the Chapter 11 Trustee filed a Motion to Sell Property of Estate Free and Clear of Liens and Encumbrances (the "Motion to Sell") [Docket Entry #140 in NWTE and Docket Entry #135 in CREIS].  On November 30, 2005, the

-8-

Trustee amended the motion to sell (the "Trustee's Amended Motion") [Docket Entry #158 in the NWTE case and Docket Entry #153 in the CREIS case]. After a hearing on December 6, 2005 on the Trustee's Amended Motion, Judge Robert C. McGuire, on December 13, 2005, issued an order whereby the bankruptcy court would "allow a sale of assets subject to later confirmation by this court with the understanding that no sale shall occur until a report of sale is filed with [this] [c]ourt and a hearing to confirm the sale is held." [Docket Entry #161 in the NWTE case Docket Entry #158 in the CREIS case].

14. Subsequently, the Chapter 11 Trustee conducted an auction on December 13, 2005, in which he accepted bids in two different forms: bids for all of the owned assets of the Debtors or, alternatively, bids for the equity interests of the Debtors. The assets of the estate to be sold included, but were not limited to, real property and improvements thereon, and all personal property, including, but not limited to, inventory, accounts receivable, furniture, fixtures, machinery, and equipment, all of which is used in the business of the Debtors.[6] Chevron credit bid $1.1 million in each case for the aforementioned assets. No other bids were received for the

_____

[6] Assets specifically excluded from the sale were Chevron U.S.A. Inc. signage, epos equipments, Church's Chicken franchise license, and equipment used in the operation of Church's Chicken at 8817 Clark Road, Dallas, Texas. *See* Docket Entry #101 from the CREIS case.

proposed asset sales.

15.  As for the equity sale, two bidders proved interested in the equity interests in the Debtors:  John T. Evans of the John T. Evans Co., Inc. ("Evans") and Charles A. Burton of the Burton Oil Co., Inc. ("Burton").  Both had purportedly previously provided the Chapter 11 Trustee with evidence of financial ability to pay.[7]  Evans was declared the higher bidder for the equity, with a bid of $130,000 per Debtor, for a total bid of $260,000.

16.  On March 6, 2006, the Chapter 11 Trustee filed a report of the results of the auction (the "Trustee's Auction Report") [Docket Entry #169 in the NWTE case and Docket Entry #166 in the

---

[7]     Evans testified during the May 30, 2006 hearing that he produced, upon request, information to the Trustee that he had the financial wherewithal to pay $260,000.  Such evidence was not presented to the court.  However, on June 6, 2006, a week after the May 30, 2006 hearing and after the close of evidence, the Debtors submitted a copy of a $260,000 check delivered on June 5, 2006, by Evans, representing funds that Evans had apparently deposited into his lawyer's trust account on that date for the proposed equity purchase [Exhibit A to Docket Entry #196 in NWTE; Exhibit A to Docket Entry #189 in CREIS], and the Debtors also submitted various items purporting to show the financial wherewithal of Evans to fund shortfalls under the Debtors' proposed plan, including a year 2005 Form W-2 for Evans from the John T. Evans Co., Inc., as well as unaudited, "current value" financial statements, apparently personally prepared (and signed) by Evans.  The court notes that the Current Joint Plan does not require Evans or any other individual to fund shortfalls under the plan but solely contemplates Debtors' cash flow funding the plan after the $260,000 initial investment of new equity by Evans.  Indeed Evans' testimony at the hearing confirmed that he was not personally guaranteeing the obligations under the plan. (May 30, 2006 Transcript at p. 12, lines 2 through 13).

-10-

CREIS case]. He articulated the results of the auction and also the pros and cons of a sale of the assets versus a sale of the equity of NWTE and CREIS. Ultimately, the Chapter 11 Trustee recommended the bid of Evans for an equity sale (the "Evans' bid") as preferable to the Chevron credit bid for the assets, simply because there was a possibility of a dividend to unsecured creditors with such bid. However, the Chapter 11 Trustee's recommendation was lukewarm at best, and expressed concern about whether the Evans' bid would lead to a confirmable plan.[8] Moreover, the Chapter 11 Trustee's recommendation seemed to ignore the stark reality that 90%+ of the dividend that the $260,000 might enable to be realized for unsecured creditors would go to Chevron—the holder of 90%+ of the unsecured creditor pool and the party opposing (or competing with) the $260,000 bid.

17. With regard to the winning equity bidder, Evans, he testified on May 30, 2006 to this court as follows:

(a) He has known Mr. Mahboubi, the Debtors' President, for many years.

(b) Evans believed himself to have a personal net worth of approximately $5 million. However, it is likely that some to-be-formed company (not Evans personally) will actually become the owner of the NWTE and CREIS stock.

---

[8] The Trustee opined: "There is an above average risk that a plan will not be confirmed." [Docket Entry #169 in the NWTE case and Docket Entry #166 in the CREIS case, both at ¶ 9].

(c) Evans has no experience running a type of business similar to the Debtors' gas stations and convenience stores.

## C. The Debtors' Current Joint Plan

18. The Debtors' Current Joint Plan, as referenced above, contemplates a $260,000 new equity infusion and a restructuring of most of the Debtors' debt.

19. It is unclear who will manage the Reorganized Debtor. Mr. Evans testified he will keep the employees that it makes sense to keep.[9]

20. In addition to the $260,000 of new equity, the Debtors' Current Joint Plan—specifically in the most recent plan modifications dated May 19, 2006 [Docket Entry #188 in NWTE and Docket Entry #182 in CREIS]—contemplates that the Debtors will enter into a new senior, secured loan from an entity called Property Tax Lending L.P. (the "PTL Loan"), in the total amount of $315,000. This is the amount projected by the Debtors as necessary to pay all ad valorem taxes that have accrued on the Debtors' properties up through 2005.[10] There was no evidence

---

[9] Mr. Mahboubi testified he will have no economic or financial interest in the Reorganized Debtor and has no agreement to manage it. However, Mr. Mahboubi did testify that he is personally paying the Debtors' attorney's fees. Transcript from May 22, 2006 hearing, at p. 224.

[10] Actually, certain evidence indicated that the unpaid ad valorem taxes of NWTE, up through 2005, are $197,361, and the unpaid ad valorem taxes of CREIS, up through 2005, are $106,135 (in the aggregate, slightly less than $315,000). However, there was also evidence that these numbers do not include Section

-12-

produced as to whom exactly the lender PTL is. In any event, under the PTL Loan, PTL shall be entitled to receive repayment of its loan from the Debtors over ten (10) years at a 13% interest rate per annum. Repayment of the loan is such that one-half (1/2) of the accruing interest will be due and payable monthly for the first twelve months, and then interest only will be due and payable during years two and three after confirmation of the Current Joint Plan. Thereafter, the balance on the PTL Loan will be amortized in equal monthly payments over a period of 84 months. *See* NTWE Trial Exhibit N and CREIS Trial Exhibit N. One of the most significant aspects worthy of mentioning about this proposed PTL Loan is that it is a *negative amortization loan* initially after confirmation of the plan—meaning essentially that the principal balance of the loan is growing, since interest is accruing faster than it is being paid.[11]

---

506(b) interest calculated to be owed by the taxing authorities and that the taxing authorities actually assert that over $322,000 is due to them.

[11]The court notes that the Debtors' evidence on this general subject of the PTL Loan was rather confusing and inconsistent. While the Debtors introduced exhibits (NWTE Trial Exhibit N and CREIS Trial Exhibit N) indicating that the PTL Loan proceeds would be used "to pay 2005 and prior years real property taxes" for NWTE and CREIS, and the Debtors' Current Joint Plan indicates that the PTL Loan proceeds will be used to pay all "ad valorem taxes" owed to Dallas County, one of the Debtors' key witnesses (Mr. Badiee) testified that the PTL Loan would be used to pay ad valorem taxes owed by the Debtors for years *2004* and prior (not year *2005* taxes) and that year *2005* taxes would be paid from money the Debtors had in the bank. *See* Transcript from May 22, 2006 hearing, p. 124. This is one of several examples of

-13-

21. The Current Joint Plan proposes to pay all ad valorem and real property taxes owed to Dallas County (except 2006 taxes), which are denominated as "Class 1" claims, on the first business day of the month following the effective date of the plan, and the Debtors provide that they will pay 2006 ad valorem and real estate taxes in the "ordinary course of business"[12] and that the taxing authorities will retain their liens relating to 2006 taxes.

22. The Current Joint Plan proposes to pay Chevron's allowed secured claims, which are denominated as "Class 3" claims (which the Debtors indicate will be "$940,000 less payments made during the case" in each case, and will be subordinated to the first liens of the taxing authorities as to 2006 taxes, and will be subordinated to the second liens of the PTL Loan), in monthly

---

inconsistent testimony or exhibits submitted by the Debtors with regard to plan implementation, feasibility, and overall Debtor operations.

In any event, the court observes one other noteworthy bit of testimony about the PTL Loan: one of the Debtors' witnesses testified that the Debtors "went shopping some several companies" to try to get alternatives to the PTL Loan and that they talked to at least one other company but "this was the best deal" the Debtors could get. Transcript from May 22, 2006 hearing, at p. 128.

[12] The court is not quite sure how to interpret "ordinary course of business" with regard to these Debtors, since they have not considered it to be within their ordinary course of business to pay ad valorem or real estate taxes for over 5 years.

payments at a 7% interest rate per annum,[13] with a twenty-five (25) year amortization and balloon payments at the end of seven (7) years.

23. Thus, if the Current Joint Plan is confirmed with all of these provisions: (a) the taxing authorities would be paid in full on the initial distribution date of the plan for years 2005 and prior; (b) the taxing authorities would maintain their first priority secured lien position on the Debtors' properties, with regard to taxes attributable to years 2006 and beyond and are promised to be paid those taxes as they became due in the ordinary course of business; (c) PTL would receive a second priority lien position on the Debtors' properties for the $315,000 PTL Loan—which second lien position would grow in size the first several months of the plan (because of the negative amortization feature of the loan); and (d) Chevron would receive a third lien position on the Debtors' properties, securing a $940,000 secured claim in each case, which third lien position would shrink in size the first several months of the plan, once again, because of the negative amortization feature of the PTL Loan.

24. The Debtors deny the PTL Loan would make Chevron any

---

[13] The Debtors represented at the May 22, 2006 hearing that this 7% figure was a mistake and that the Debtors now intend to offer 8% per annum on Chevron's secured claims (yet another example of inconsistencies in evidence submitted by the Debtors).

worse off than Chevron currently is (arguing that PTL is simply stepping into the shoes of the Dallas County taxing authorities, which are already ahead of Chevron in lien position).  The Debtors do not seem to understand the impact of a negative amortization loan, and do not seem to appreciate the language at Section 1129(b) of the Bankruptcy Code, that provides that a secured creditor being "crammed down" in a chapter 11 plan is entitled to retain its liens or else receive the indubitable equivalent of its claim.

25.  Moving further through the Current Joint Plan, it proposes to pay holders of unsecured claims who are owed greater than $10,000, which are denominated as "Class 6" Claims, 10% of their allowed claims on the initial distribution date of the Current Joint Plan and 20% over 60 months in equal monthly installments.[14]  This Class 6 appears to consist only of Chevron and perhaps Citicorp in the NWTE case (if Citicorp genuinely has an unsecured claim against NWTE),[15] and to consist only of

---

[14] Although there have been numerous plan and disclosure statement modifications, the court is looking at what appears to be the latest Debtor proposal for unsecured creditors, embodied in the document dated November 20, 2005, entitled "Second Supplement to Second Amended Disclosure Statement Pursuant to Section 1125 and Second Amended Plan of Reorganization Dated May 25, 2005" [Chevron Trial Exhibit 15].

[15] *See* discussion of Citicorp/Balboa in footnote 4, *supra*, and paragraph 27, *infra*.

Chevron and JFG Concrete, Inc.[16] in the CREIS case.

26. The Current Joint Plan proposes to pay holders of unsecured claims who are owed less than $10,000 (the dozen or so at most that there are), which are denominated as "Class 7" Claims, 10% of their allowed claims on the initial distribution date of the plan and 40% of their claims in monthly payments over 24 months.[17]

27. The Current Joint Plan also includes three (3) other classes of claims: Class 2 "Priority Tax Claims"; Class 4 "Balboa Capital Secured Claim"; and Class 5 "Executory Contracts and Leases" comprised of Burton Oil. The court finds that Classes 2 and 5 are improperly created classes and Class 4 is of highly questionable legitimacy. First, priority tax claims (as described in Class 2) are not supposed to be classified in a Chapter 11 plan for voting or other purposes, so Class 2 must be disregarded. 11 U.S.C. §§ 1123(a)(1) and 507(a)(8). Second, the Class 5 Executory Contract claim of Burton Oil is improperly classified because not only was the Burton Oil contract a *postpetition* contract that the Debtors entered into with bankruptcy court approval during the cases (not an executory contract, the rejection of which would give rise to a prepetition

---

[16] JFG Concrete, Inc. has filed a $47,574 unsecured proof of claim [Proof of Claim # 3] in the CREIS case.

[17] *See* Chevron Trial Exhibit 15, once again.

-17-

unsecured claim),[18] but the Current Joint Plan specifies that Burton Oil is waiving any "claim" and will enter into a new contract with the Debtors. Thus, the notion of there being any prepetition claim here to classify and on which to provide treatment for Burton Oil is illusory. Finally, with regard to Class 4, the court questions the notion of Citicorp/Balboa having a legitimate secured claim in the NWTE case. As referenced in footnote 4, *supra*, the only evidence the court has observed regarding the Citicorp/Balboa claim is Proof of Claim #17 in the NWTE case, of which the court takes judicial notice. In Proof of Claim #17, Citicorp alleges a "Claim relating to the Debtor's possession of the equipment that Citicorp Leasing financed for Flash Mart Stores, Inc."—with no loan documents attached. Since no documents are in the record indicating why or how NWTE's has liability on this claim incurred by Flash Mart Stores, Inc., a non-debtor, the court questions why this is a legitimate claim in the NWTE case. In any event, at best, Class 4 is a legitimate class in the NWTE case but not in the CREIS case. The further relevance of this fact will be discussed later in the opinion.

28. Chevron argues that the fundamental issue with regard to its Motions to Lift Stay and Motions to Convert that are now being re-urged is whether the Debtors are able to effectuate a

---

[18] *See* Docket Entry #20 in the NWTE case and Docket Entry #14 in the CREIS case (Orders Granting Debtors' Emergency Motion to Enter into Motor Fuel Supply Contracts), dated June 10, 2004.

confirmable plan. In other words, the court should simply lift the automatic stay as to Chevron or, alternatively, convert the cases to Chapter 7, at this point, because of the inability of the Debtors to effectuate a plan (more than two years down the road in these cases)—this being the "cause" to lift the stay or "cause" to convert. *See* 11 U.S.C. §§ 362(d)(1) & (2) and 1112(b)(2). Among other problems with confirmation alleged by Chevron are: (a) unfair or improper treatment of Chevron's claim proposed under the Plan under Sections 1129(a) and (b) (*i.e.,* repayment of Chevron is proposed at far too low a rate of annual interest and subordination of Chevron's liens to the proposed PTL Loan is also improper); and (b) lack of feasibility of the Current Joint Plan.

29. The Debtors essentially concede that their ability to effectuate a plan at this juncture is the fundamental issue with respect to the Motions to Lift Stay and Motions to Convert. The Debtors conceded in opening argument that the issues relevant to Chevron's motions were "*can this debtor make the proposed plan payments*?" and "*two, what is the appropriate interest rate, which is really a confirmation issue. But we're prepared to address that.*" Transcript of May 22, 2006 hearing, p. 15, lines 14-25.

30. Indeed, this court agrees that these are the relevant issues with regard to Chevron's motions and that one of the most significant issues relevant to whether the Current Joint Plan is

confirmable is whether the treatment proposed for Chevron's secured claims (whether they be calculated at $940,000 or something slightly less in each case)[19] would provide Chevron with a stream of payments over the life of the plan, the *present value of which* will equal the secured claims of $940,000. This turns on whether the 8% per annum interest rate proposed is an appropriate rate of interest with regard to the Chevron loans.

## D. Expert Testimony on an Appropriate Rate of Interest for Chevron's Secured Claims

31. With regard to this issue, Chevron offered as an expert witness Mr. Jay Krasoff, a managing director of middle market investment bank Chiron Finance Group ("Chiron"), who is in charge of its capital raising and reorganization practice.[20] Mr. Krasoff, among other things, assists companies in financial distress or restructuring modes with their attempts to find

---

[19] The court will assume, for sake of argument, that $940,000 or something approximate to it is the amount of Chevron's secured claim in each case, since that is the "placeholder" approximate number that even the Debtors have used in their Current Joint Plan and in prior stipulations and arguments. The precise number is not critical to the court's analysis, and the court makes no finding as to the precise amount of Chevron's claim.

[20] Mr. Krasoff has an undergraduate accounting degree from the University of Texas and also attended the University of Texas graduate business school program; he became a CPA and worked at the predecessor to KPMG in the tax department; thereafter, he worked in the real estate development business for 12 years in a CFO-type position; he financed nearly $300 million worth of real estate development during those years; he worked in the private equity side of another business; and has, for the past five and one-half years, been involved in the investment banking business and in restructuring corporate finance.

capital.  Mr. Krasoff, and personnel under his direction and
control at Chiron, prepared two expert reports (Chevron Trial
Exhibits 48 and 49) that were admitted into evidence and that
were highly relevant, along with Mr. Krasoff's testimony, on the
subject matter of what would be an appropriate rate of interest
for these Debtors to offer to Chevron under a proposed plan.

32.  Mr. Krasoff testified that he was asked to analyze
whether 6%, 7% or 8% annual interest rates—all of which these
Debtors have offered to Chevron under proposed plan drafts—were
market rates of interest for the type of secured loans that
Chevron would have under the Plan.  The other task Mr. Krasoff
was asked to perform was to review the actual financial
performance of the Debtors, and normalize their expenses in
accordance to what they would be post-reorganization, and compare
those normalized financials to the Debtors' projections they are
using to support the feasibility of their plan.

33.  Mr. Krasoff testified that he had analyzed the
following data in reaching some of his expert conclusions in this
matter:  projections contained in the Debtors' various disclosure
statements; all of the Debtors' plans that had been filed and
amendments thereto; the Debtors' original bankruptcy petition;
the Debtors' Schedules and Statement of Financial Affairs; the
Debtors' current actual financial statements and the Debtors'
financial statements from years past; the Debtors' monthly

operating reports throughout the cases; appraisals on the Debtors' properties obtained by independent appraisers hired by Chevron; current prime rate; current corporate bond rates; Chevron's cost of capital; like-kind transactions in the market place of real estate financings; and possible opportunities for these Debtors to obtain loans from conventional lenders, structured finance groups at major lenders, sale-leaseback providers, and the so-called "special situation lenders."

34.  Mr. Krasoff's testimony can be summarized as follows with regard to the proposed interest rate offered to Chevron under the Current Joint Plan:

(a)  Given the small size of these loans ($940,000), they would typically be quoted an interest rate as a function of prime rate.  Prime is the best rate given to a borrower that is non-rated by Standard & Poor's, Forbes, or Moody's.  The current "general" prime rate (*Wall Street Journal* prime rate; *see* Chevron Trial Exhibit 86), at the time of trial, was at 8%.[21]  Since March 2004, prime rate has gradually been rising.  Significantly, Chevron's own current cost of capital averages about 8% (some of its debt is less and some more), so what the Debtors have been proposing to pay Chevron (6%, 7%, or 8%) is less than or equal to Chevron's own cost of capital.

---

[21] The court takes judicial notice that, now, prime is slightly higher.

(b) Mr. Krasoff further testified that he had explored, through many channels, financing sources for a hypothetical entity similar to these Debtors. Corporate bond financing is not an option for this small size of debtor. Therefore, Mr. Krasoff went to community banks, sale-leaseback providers, and special situation lenders. These would be the only sources of financing for these type debtors, other than some private individual lender who might be willing to loan to them.

(c) With regard to traditional community banks, what Mr. Krasoff found was that without a substantial, meaningful guarantee and without a minimum of 20% new equity down payment to a traditional lender, that financing for this type of debtor simply would not be available from a commercial/traditional bank. If these things were offered (meaningful guarantee and a 20% down payment), a traditional bank lender would offer prime plus 2%, plus another 2% for origination (or 12%—the testimony was that the 2% for origination would have to be paid in cash up front as a fee for this type of loan). A traditional lender would expect a first lien—it would not find acceptable the PTL Loan being senior to it.

(d) With regard to sale leasebacks, Mr. Krasoff's testimony was that a sale leaseback lessor would expect ad valorem taxes to be paid and good clean title (no PTL lien) in connection with its sale leaseback transaction. The lessor would

-23-

want some limited guarantee as to payments/performance for a few years (and with regard to that, the lessor would look at cash flows the last few months or year, to make it feel secure in addition to valuation of the property). While the lessor would make a 100% "loan," based on its own fresh appraisals (and would not expect the 20% down of a traditional lender), the interest rate the lessor would expect would be more likely to be around 13 1/2%.

(e) With regard to the so-called special situation lenders, Mr. Krasoff testified that there were three special situation lenders that he knew of in Dallas that might entertain lending in this type of situation. They informed him they would require at least 10% equity contribution into the current capital structure (and they would want fresh appraisals), they would want some limited guarantee as to performance not just value (based on 6 months or 12 months of at least "breaking even" for the business—if not more of a cushion than simply "breaking even"), and there would likely be a 4% to 5% origination fee, plus a 4% to 5% interest rate or higher above prime (so if prime was 8%, that would be 12% to 13% plus the 4% to 5% origination fee; and, again, loan-to-value would be no more than 90%). This testimony was elaborated upon in Chevron Trial Exhibit 87.

(f) The further testimony of Mr. Krasoff was that the original Chevron loans had a 6% interest rate. However, the

original loans were not only made at a time when prevailing interest rates were lower, *but were made by Citibank and were guaranteed by Chevron*, and the Chevron guarantee was a material part of that 6% interest rate being acceptable.

(g) Finally, Mr. Krasoff testified that any lender in this situation would consider a number of risk factors in deciding what interest rate to ultimately charge.  Among those factors looked at in this situation would be the management team and its track record; the lack of equity or highly leveraged status of the business; the environmental risk of convenience stores (their very thin profit margin); and the fact that the company would be just emerging from bankruptcy.  The testimony was that any lender would take all of these factors into account in further pricing the loan interest rate.  Without a substantial, credible guarantee and a substantial equity infusion (10% to 20%), the only option would be a prime plus 5% to 6% loan with the lender still expecting some guarantee of cash flow and a first lien.  Bottom line, Mr. Krasoff's research led him to conclude that the only lender that might be out there in the market place that would do what the Current Joint Plan is proposing with regard to Chevron (*i.e.,* provide a 100% loan, with no credible guarantees, no performance track record that shows break even performance or a cushion above break even, and no first lien position), would be some high net wealth individual.

*See* Chevron Trial Exhibit 49.  But, again, there is a market of special situation lenders that would do exit financing to these types of Debtors with a 10% to 20% down payment, good quality guarantees,[22] at a minimum of 4% to 5% over prime or higher (plus significant origination fees) with more limited guarantees.  Mr. Krasoff gave several examples of such institutions and names of folks with whom he had spoken in doing his research for his reports and testimony.

35.  The court finds the testimony of Mr. Krasoff summarized above to be highly credible and based on what seemed to be thorough research and very specific investigations.

36.  The Debtors' only contradictory evidence on the topic of the interest rates was not terribly persuasive or credible. The Debtors' CPA, Mr. Badiee, who is involved in overseeing the Debtors' financial operations and recording financial transactions, testified that he was involved with several

---

[22] The court notes that there are two personal guarantees currently on the Chevron loans to the Debtors that the Debtors testified will be unaffected by the Plan.  Those guarantees are from Mr. Mahboubi, the 70% owner and President of the Debtors, and another from a second individual who is the 30% owner of both Debtors.  The evidence further indicated that both of these guarantors are fighting the enforceability of their personal guarantees in state court and that Mr. Mahboubi has a negative net worth of $1.7 million approximately.  Transcript from May 22, 2006 hearing at p. 226-228.  There was further testimony that Mr. Mahboubi has an interest in five Chevron stations and convenience stores, with four of them currently in separate bankruptcy cases, and the fifth one having already exited from a previous bankruptcy case.  There was no evidence whatsoever as to the financial wherewithal of the 30% owner of the Debtors.

businesses owned or operated by Mr. Mahboubi.  Mr. Badiee further testified that one similar business (a gas station/convenience store in Dallas) that was in a pending Chapter 11 case in Judge Harlin Hale's court was offering to pay their lender, Compass Bank, 6.5% interest on its loan coming out of bankruptcy (and it was a 100% loan) and Compass was agreeing to that.  Additionally, Mr. Badiee testified that there was another similar business in which Mr. Mahboubi was involved about a year ago that needed to go through a refinancing or restructuring and, in that situation, Wilshire State Bank agreed to a 8.25% loan.[23]  Transcript from May 22, 2006 hearing, at pp. 111-113.

## E.   Testimony Regarding Plan Feasibility

37.   The other most significant issue relevant to whether the Current Joint Plan is confirmable is whether the plan is feasible.  First, Mr. Krasoff testified that these Debtors have problems in preparing reports and projections.  Their numbers often "didn't flow, or add up.  And it's been a consistent pattern over the past year and a half that we've been involved with this case that the actual financial statements are moving targets if projections don't flow.  And [monthly operating reports] are difficult to tie to actual financial statements.  So

---

[23] Mr. Mahboubi later testified that he had explored whether Wilshire State Bank would refinance NWTE and CREIS, but Wilshire said it would not consider it until the companies had a year history outside of bankruptcy.  Transcript from May 22, 2006 hearing at p. 260.

it's very difficult to tie down projections against actual financing statements."  Transcript, May 22, 2006 hearing, p. 22, lines 1-7.

38.  Mr. Krasoff nevertheless testified that he attempted to review the actual financial performance of the Debtors, normalized their expenses in accordance with the proposed plan, and compared those to the Debtors' pro forma projections.  By "normalizing expenses," some examples are that Mr. Krasoff reduced legal and accounting expenses that might not be recurring because they are associated with the reorganization costs, properly added in accruing property taxes in the future, and then also put in the plan numbers for class treatments.  *See* Chevron Trial Exhibits 89, 90, 91 and 92.

39.  One thing Mr. Krasoff did in the "normalizing" process that was criticized by the Debtors and may create some slight inaccuracy on the part of his reports was using first quarter revenue numbers for the Debtors and multiplying by four to get annualized numbers (there was some evidence that revenues go up during summer months).

40.  In any event, the projections re-created by Mr. Krasoff were not remarkably different from the Debtors' numbers—there was testimony that they were within $10,000 or $15,000 of the Debtors' projections in their disclosure statements.

41.  The bottom line is that Chevron's Trial Exhibits 89

-28-

through 92, which the court finds mostly credible and reliable, reflect that under the 6% originally proposed interest rate offered to Chevron in the Debtors' original plan, that the Debtors would have negative cash flow through 2007 (based on first quarter actual numbers for 2006 and projections through 2007).

42. Similar to the Debtors' testimony with regard to appropriate rates of interest, the Debtors' contradictory evidence on the topic of plan feasibility was not terribly persuasive or credible. The Debtors' CPA, Mr. Badiee, once again testified on this topic, and testified that revenues had been better for the businesses recently because of gas prices and a better economy. Mr. Badiee and Mr. Mahboubi, the Debtors' President, also testified that, although NWTE formerly had a tenant, Quizno's, in the convenience store and Quizno's was no longer in there, that NWTE would "probably" have new tenants lined up soon—a "Taqueria," a check cashing business and maybe a car wash, inspection, and repair business if they remodeled and improved that location. New tenants would be good for NWTE's future. Transcript from May 22, 2006 at pp. 72-73; 206-212. With regard to CREIS, Mr. Badiee's testimony was that this business currently has a Church's Chicken on site and CREIS planned to keep Church's Chicken as a tenant (later testimony clarified that the Debtors' President, Mr. Mahboubi, actually

owned the Church's Chicken franchise, not the Debtor CREIS), and
CREIS would hopefully add a check cashing business and car wash
business as tenants (subject to some minor repairs being done to
make a car wash feasible).  The further testimony of Mr. Badiee
and Mr. Mahboubi was that they had not pursued more concretely
the plans with future tenants because they were in bankruptcy.
It was also suggested that the Chapter 11 Trustee was to blame
for not making efforts to implement any changes to the business.
Transcript from May 22, 2006 hearing, at pp. 75-76.[24]  The court
notes that there was no credible evidence that these new tenants
are anything more than speculative hopes/plans of the Debtors.
Not only is it not accurate to suggest that the Debtors could not
pursue new tenants while in bankruptcy (a Chapter 11 debtor or
trustee can always present for court approval a postpetition
transaction that reflects a reasonable business opportunity for
the estate) but, even if new potential tenants were reluctant to
propose a deal to the Debtors while in bankruptcy, the Debtors
could have introduced into evidence some evidence such as signed
contracts contingent upon confirmation, signed letters of intent,

_____

[24] In addition to blaming the Chapter 11 Trustee for not
being involved with implementing changes to the Debtors'
businesses, Mr. Badiee blamed nonpayment of the Debtors' 2005 ad
valorem tax payments during the cases on the Chapter 11 Trustee
not giving the Debtors permission to pay these taxes.  Transcript
of May 22, 2006 hearing, at p. 89, lines 4-23.   The court found
this testimony a little "hard to swallow" since these Debtors had
not paid ad valorem taxes prepetition since 2001.

signed letters of interest, or witness-representatives of these
possible future tenants.  Since the Debtors had nothing of this
nature, the court is not persuaded that the Debtors genuinely
have tenants lined up with enough certainty to find that their
existence bears on plan feasibility.  Moreover, the testimony was
that having these new tenants would only add between $4,000 and
$5,000 in revenue per month to the gross revenue of the two
Debtors' businesses.[25]  Transcript from May 22, 2006 hearing at
pp. 119-120 (the Debtors' CPA first testified $2,000 per month
per Debtor, and then increased his estimate).  This is not enough
to make that significant a difference in the feasibility of the
Plan.

43.  In any event, Mr. Badiee further testified about
reports he had prepared, asserting that these reports were more
accurate than Mr. Krasoff's reports regarding future projections
for the companies and plan feasibility.  The "bottom line" was
that Mr. Krasoff's reports differed mostly because of his
allegedly not taking into account the cyclical nature of the
businesses (better summer months), future tenants, he allegedly
did not back out payments made during the case to Chevron and
perhaps depreciation, as part of his "normalizing" his
projections to assess whether the future plan payments could be

---

[25] Apparently, Mr. Mahboubi has some of these hoped-for
tenants at other locations he owns, and this is the source of
information for these estimates.

made to Chevron under the Plan, and finally the Debtors'
testimony was that they would have certain rebates and credits
from their fuel suppliers that were not properly reflected in
Chevron's "normalized" projections.  In summary, Mr. Badiee's
reports show that the businesses will be slightly profitable and
the Debtors will be able to make the required payments to
Chevron, with some slim margin to spare.  CREIS' Exhibits F, H,
L, and M and NWTE Exhibits F, H, L and M.

44.  Additionally, on the topic of feasibility, the court
observes that the tax returns for NWTE for the years ending in
2002, 2003, and 2004 show continual losses.  The tax returns for
CREIS for the years ending in 2001, 2002, 2003, and 2004 show
either zero earnings or net losses.  NWTE's actual financial
results for 2005 show negative cash flow as well.  Chevron
Exhibit 4 for NWTE demonstrates positive cash flow of $113,112
for 2005, but after adding depreciation back and then deducting
anticipated plan payments or debt service, the cash flow turns
negative.  The situation appears worse for CREIS, which begins
the analysis at -$152,847.

45.  Finally, the court observed that when the Debtors'
President, Mr. Mahboubi, was asked if he thought the Debtors
could make their plan payments, he testified: "I'm pretty
confident they will make the payment."  Transcript from May 22,
2006 hearing, p. 217, line 10.  His answer was anything but a

ringing endorsement of the Current Joint Plan.[26]

46. The court found much of the testimony of Mr. Mahboubi, the Debtor's President, lacking in credibility. Among other things, he did not seem to understand when ad valorem property taxes become due (May 22, 2006 Transcript at p. 229 line 19 through p. 230 line 10), he gave what seemed like some rather farfetched testimony about low income people's gasoline buying habits (May 22, 2006 Transcript at p. 264 line 4 through p. 265 line 21), and he testified that he has asserted claims and causes of action against Chevron in a state court action regarding rebates Chevron allegedly owes that would (if true) belong to the estate, not him personally, and should only be asserted for the benefit of creditors generally. *See* May 22, 2006 Transcript at pp. 271-272. Such claims and causes of action have not been disclosed in the bankruptcy cases.

47. Lastly, it is noteworthy that the Chapter 11 Trustee did not show up for the hearings on either May 22 or 30, 2006. It is significant to the court that the Chapter 11 Trustee takes no position in this matter. The Chapter 11 Trustee is an experienced and respected bankruptcy lawyer and trustee who is familiar with fiduciary duties. The court can only assume that

---

[26] A few minutes later, however, Mr. Mahboubi did testify that he thought the businesses were going to do better in 2006 and that they might even be able to pay Chevron as much as a 10% interest rate. Transcript from May 22, 2006 hearing, at p. 219, line 13.

he thought it was more consistent with his fiduciary duties not to run up administrative fees in these cases, opposing Chevron, rather than to appear and advocate for the Debtors to be able to reorganize under their proposed plan.

### CONCLUSIONS OF LAW

**A.   Grounds for Granting Chevron Relief from the Automatic Stay: (i) There is No Equity in the Debtors' Properties, and (ii) There is No Chance of an Effective Reorganization in Prospect.**

The court concludes, based on the above-referenced findings of fact, that it is time to put an end to these two year old cases.  Not only is it stipulated that there is no equity in the Debtors' properties, but the overwhelming evidence reveals that there is no reasonable chance of an effective reorganization in prospect.  The Debtors are no closer to emerging from these Chapter 11 cases now than when they filed these cases two years ago.  Thus, the court is required, under Fifth Circuit precedent, not to let these cases linger on any longer, in the face of vehement opposition from the major creditor and the patently unconfirmable plan that is on the table.

The filing of a petition under Title 11, of course, results in the imposition of an automatic stay.  11 U.S.C. § 362(a). The purpose of the automatic stay is to give the debtor a "breathing spell" from his creditors, and also, to protect creditors by preventing a race for the debtor's assets.  *Browning v. Navarro*, 743 F.2d 1069, 1083 (5th Cir. 1984).  Subsection (d)

-34-

of Section 362 identifies when the court shall grant stay relief, upon the request of a party in interest, in the form of termination, annulment, modification, or conditioning of the stay.  In particular, "[i]f a secured creditor desires relief from the stay, it may proceed under § 362(d)."  *Canal Place Ltd. P'ship v. Aetna Life Ins. Co. (In re Canal Place Ltd. P'ship)*, 921 F.2d 569, 576 (5th Cir. 1991)).  Such is the case here.

Under Section 362(d)(2), the court must grant relief from the automatic stay if "(A) the debtor does not have any equity in [its] property; and (B) such property is not necessary to an effective reorganization."  Here, the Debtors concede that they have no equity[27] in the properties.[28]  Thus, the Debtors have the burden of proving that the properties are necessary to an effective reorganization.  *See* 11 U.S.C. § 362(g).

It is undisputed that the Debtors will be unable to reorganize without the properties.  However, the properties must

---

[27]"'Equity' as used in section 362(d) portends the difference between the value of the subject property and the encumbrances against it."  *Sutton v. Bank One, Texas, N.A.*, 904 F.2d 327, 329 (5th Cir. 1990)(citing *Stewart v. Gurley*, 745 F.2d 1194 (9th Cir. 1984); *In re Cardell*, 88 B.R. 627 (Bankr. D.N.J. 1988)).

[28]"In every case where a creditor seeks relief under § 362(d)(2), the creditor has the burden to establish lack of equity in the property . . . ."  *Canal Place Ltd. P'ship v. Aetna Life Ins. Co. (In re Canal Place Ltd. P'ship)*, 921 F.2d 569, 576 (5th Cir. 1991) (citing *Timbers*, 484 U.S. at 365).  In light of the Debtors' concessions, the court need not address such.

be "essential for an effective reorganization *that is in prospect*." *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 376 (1988). "This means . . . there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" *Id.* "However honest in its efforts the debtor may be, and however, sincere its motives, the [Court] is not bound to clog its docket with visionary or impracticable schemes for resuscitation." *First Jersey Nat'l Bank. v. Brown (In re Brown)*, 951 F.2d 564, 572 (3rd Cir. 1991) (quoting *Tennessee Publ'g Co. v. American Nat'l Bank*, 299 U.S. 18, 22 (1936)). In essence "'[c]ourts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization.'" *In re Canal Place Ltd. P'ship*, 921 F.2d at 577; *see also In re Brown*, 951 F.2d at 572 (quoting the Fifth Circuit in *In re Canal Place Ltd. P'ship*).

In *Canal Place Ltd. Partnership v. Aetna Life Insurance Co. (In re Canal Place Ltd. Partnership)*, 921 F.2d 569, 577 (5th Cir. 1991)), the Fifth Circuit affirmed the bankruptcy court's analysis and application of *Timbers of Inwood Forest Assocs., Ltd.,* 808 F.2d 363, 370 (5th Cir. 1987), *aff'd* 484 U.S. 364 (1988) ("*Timbers*"). *Timbers* mandated that the court "evaluate the reorganization profile of the debtor in order to determine whether there was a reasonable prospect for a successful reorganization within a reasonable time before allowing the stay

to remain in effect." *Canal Place Ltd. P'ship*, F.2d at 571. After reviewing the debtor's assets, the claims against the debtor, the debtor's plan of reorganization, and the debtor's history prior to the bankruptcy proceeding, which the court noted that "[s]ince the Debtor's formation, it has always suffered recurring losses," the bankruptcy court held, as affirmed by the Fifth Circuit per curium, that the Chapter 11 debtor has failed to establish a reasonable prospect of reorganization, and thus undersecured creditors were entitled to relief form the stay in order to foreclose on the property.[29]

Here, the court concludes that there is no chance of an effective reorganization in prospect. NWTE and CREIS have been on the court's docket since June 8 and 9, 2004. Since their inception, these cases have essentially been a two-party dispute between the Debtors and their largest undersecured creditor, Chevron. Other than the taxing authorities, there are few other creditors in these cases. While these cases do not technically meet the codified definition of a "single asset real estate" case

---

[29] In another post-*Timbers* case, *Sutton v. Bank One, Texas, National Association (In re Sutton)*, 904 F.2d 327, 331 (5th Cir. 1990), the Fifth Circuit ultimately determined that the evidence presented supported the court's conclusion that an effective reorganization by the debtor was not feasible within a reasonable amount of time. To reach their conclusion, the court made special note of three facts: (1) only two tracts of land comprised debtor's entire bankruptcy estate, (2) debtor had no net income, and (3) debtor was "in arrears on the tax payments on the two aforementioned properties." *Id.* at 328, 331.

under 11 U.S.C. § 101(51B), the Debtors' only substantive assets are the collateral securing Chevron's loans to the Debtors—*i.e.,* the two properties housing the two gas stations/convenience stores.  During the course of NWTE and CREIS, the Debtors have failed to generate a positive cash flow and, to date, remain in the red.  During the past two years, the Debtors have failed to submit a feasible plan for reorganization.  The Debtors have failed to establish a reasonable prospect of reorganization, and thus Chevron is entitled to relief from the stay.

**B.  The Primary Reason the Current Joint Plan Is Patently Unconfirmable and, thus, Why No Reorganization is in Prospect: the Interest Rate Proposed on the Chevron Secured Claims is not Sufficient.**[30]

---

[30] *See* 11 U.S.C. § 1129(b)(2) which is the applicable statute here.  Specifically, the Debtors' plan cannot be confirmed or "crammed down" over the objection of Chevron unless the plan is found to be, among other things, "fair and equitable" as to Chevron.  As to what would be "fair and equitable" to a secured creditor, Section 1129(b)(2) provides, in pertinent part:

> For purposes of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>   (A) With respect to a class of secured claims, the plan provides–
>   (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>       (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property . . ..

With respect to the Debtors' plan, the battleground has always centered, and continues to center, around the rate of interest the Debtors are proposing to pay Chevron.  Initially, the plan submitted by the Debtors proposed to pay Chevron on its secured claims interest at the rate of *5%* per annum (amortized over twenty years).[31]   A few months later, the Debtors submitted an amended plan whereby they each offered to pay Chevron the amount of its secured claims amortized over twenty years with interest thereon at the rate of *6%* per annum.[32]  Later, the Debtors filed a modification to the second amended plan in which Chevron was to be paid its secured claim amortized over twenty-five years with interest thereon at the rate of 7% per annum.[33]  The Debtors testified at the May 22, 2006 hearing that the 7% interest rate used in the modification to the second amended plan really was intended to be 8%, and this was what they were now going to propose to Chevron.

While this court is faced with a *Chapter 11* plan, this court believes it is appropriate to start its analysis with regard to the interest rate being offered to Chevron with *Till v. SCS Credit Corp.*, 541 U.S. 465, 469-71 (2004).  In the *Till* case, the

_____

[31] First Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code Proposed by the Debtor, § 5.03(a).

[32] First Amended Plan, § 5.03(a).

[33] Second Amended Plan Modification, § 5.03(a).

United States Supreme Court addressed the proper rate of interest required to be used with regard to payments to secured creditors on a cram down loan under a proposed Chapter 13 plan.  The Court assessed five possible methods for calculating an appropriate interest rate:  the coerced loan theory, the presumptive contract rate approach, costs of funds approach, formula approach, and risk-free approach, ultimately declaring the formula approach the victor.  *Id.* at 479-80.  Under the formula approach, the Court indicated that, in deciding upon the appropriate rate of interest that must be paid to a secured lender being crammed down under a Chapter 13 plan, one starts with the national prime rate of interest charged to creditworthy commercial borrowers, and then adjusts that rate to appropriately reflect the typically greater risk of nonpayment by debtors who have filed bankruptcy.  "The appropriate size of that risk adjustment depends . . . on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan."  *Id.* at 479.  Thus, if *Till* applies to the case at bar, this court should start with the 8% national prime rate put into evidence in these cases, and then determine what the appropriate adjustment to that rate is, based on the risks and the character of the underlying obligations owed to Chevron.

However, since *Till*, there has been much debate about its applicability to Chapter 11 cases.  *See, e.g., In re Mirant*, 334

B.R. 800, 820-24 (Bankr. N.D. Tex. 2005). The debate was largely fueled by a footnote in *Till* that offers a guiding principle that "when picking a cram down rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." *Till*, 541 U.S. at 476 n.14.[34] In other words, rather than mechanically apply the formula approach in Chapter 11, one might have plenty of evidence of what an available market rate is for a similar loan to the Chapter 11 debtor at issue, since there is a universe of lenders who regularly make exit loans to Chapter 11 debtors.

---

[34] The Court elaborated in *Till*:

This fact helps to explain why there is no readily apparent Chapter 13 "cram down market rate of interest": Because every cram down loan is imposed by a court over the objection of the secured creditor, there is no free market of willing cram down lenders. Interestingly, the same is not true in the Chapter 11 context, as numerous lenders advertise financing for Chapter 11 debtors in possession. See, e.g., Balmoral Financial Corporation, http://www.balmoral.com/bdip.htm (all Internet materials as visited Mar. 4, 2004, and available in Clerk of Court's case file) (advertising debtor in possession lending); Debtor in Possession Financing: 1st National Assistance Finance Association DIP Division, http://www.loanmallusa.com/dip.htm (offering "to tailor a financing program . . . to your business' needs and . . . to work closely with your bankruptcy counsel"). Thus, when picking a cram down rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce. In the Chapter 13 context, by contrast, the absence of any such market obligates courts to look to first principles and ask only what rate will fairly compensate a creditor for its exposure.

*Till*, 541 U.S. at 476 n. 14.

-41-

This court feels compelled to take the cue from *Till* and not mechanically apply the "formula approach" in the Chapter 11 cases at bar.  Rather, the court here has significant evidence to explore what an efficient market might produce for loans similar to the Chevron loans proposed under the Debtors' plan and, from that, make a determination what the appropriate rate is for Chevron under the Debtors' plan.

Reflecting back on the testimony from Mr. Krasoff, he had "shopped" the Chevron loan to community banks, sale leaseback lenders, and "special situation" lenders, among others.  His testimony convinced this court that the only market for this loan at the current time was a "special situation lender" or a high wealth individual.  However, the testimony was that a special situation lender would not make a loan to these Debtors without a substantial, credible guarantee and a substantial equity infusion (10% to 20%), and then the likely interest rate would be a prime plus 4% to 5%, with the lender still expecting some guarantee of cash flow and a first lien (and maybe some significant origination fee).  Thus, Mr. Krasoff's research led him to conclude that the only lender that might be out there in the market place that would do exactly what the Current Joint Plan is proposing with regard to Chevron (*i.e.,* provide a 100% loan, with

no credible guarantees,[35] no performance track record that shows break even performance or a cushion above break even, and no first lien position), would be some high net wealth individual. Yet Mr. Krasoff seemed equivocal that there was anyone (a high wealth individual or any other lending source) that would be willing to lend exactly as these Debtors are proposing—*i.e.,* no lender would do a 100% loan without credible guarantees in place and maybe not even without some historical financial performance about which it could feel good.

While the Debtors were extremely critical of this testimony and suggested that an interest rate over 8% in this industry was unheard of, the Debtors were essentially hoisted by their own petard by the PTL Loan that they obtained on the eve of trial. This $315,000 loan that would prime Chevron (and have plenty of equity cushion above it) was obtained at a 13% interest rate. This, ironically, proved Mr. Krasoff's point as to the marketplace as vividly as his own testimony.

Additionally, the Debtors wanted this court to consider as persuasive some other bankruptcy deals in which they had been

---

[35] The court does not consider the guarantees of Mr. Mahboubi and of the 30% owner of these Debtors to be credible since Mr. Mahboubi has, at best, a negative $1.7 million net worth and a history of his businesses going into bankruptcy.  There was no evidence to assess the bona fides of the other guarantee (*i.e.,* the guarantee of the 30% owner)—all this court knows is that the 30% owner is contesting his liability under his guarantee to Chevron in a state court lawsuit.

involved and in which some traditional lenders had agreed to near prime or below prime interest rates. Not only is what two lenders allegedly agreed to in two other bankruptcy cases not very persuasive, but the overall tone of the Debtors' testimony and arguments was that this court should adopt some type of a coercive loan approach. Some courts have essentially adopted this type of approach. *Bank of Montreal v. Official Comm. Unsecured Creditors (In re American Home Patient, Inc.)*, 420 F.3d 559, 565-68 (6th Cir. 2005). This approach basically condones using an interest rate for a crammed down lender that does not fairly take into account a reorganized debtor's capital structure and risk profile. This court disagrees with this theory and believes it is inconsistent with *Till,* which provides that where the debtor's plan provides for installment payments, "the amount of each installment must be calibrated to ensure that, over time, the creditor receives disbursements whose total present value [as of the effective date of the plan] equals or exceeds that of the allowed claim." *Till*, 541 U.S. at 469. This approach also may be construed as inconsistent with *Fin. Sec. Assurance Inc. v. T-H New Orleans Limited Partnership (In re T-H New Orleans Limited Partnership)*, 116 F.3d 790, 801 (5th Cir. 1997) (the Fifth Circuit affirmed the bankruptcy court's determination of the appropriate discount rate under 11 U.S.C. § 1129(b)(2)(A)(i)(II) because it "reflect[ed] the present value of [the creditor]'s

-44-

claim and account[ed] for the specific level of risk in th[e] case"). *See also Mississippi State Tax Comm's v. Lambert (In re Lambert)*, 194 F.3d 679, 684 (5th Cir. 1999) (by analogy, in the context of unsecured tax claim treatment required under Section 1129(a)(9)(C), the Fifth Circuit held that "the debtor's characteristics, e.g., the quality of the debtor's security and the risk of default . . . determine the interest rate under 11 U.S.C. § 1129(a)(9)(C)").

This court believes that the correct discount rate for purposes of Section 1129(b)(2) should fairly consider the rate that the market would require debtors to pay for financing the amount of the secured creditor's claim, and the market rate would necessarily take into account *loan-specific and debtor-specific criteria* (*e.g.,* the amount financed, the ratio of the amount financed to the debtor's assets, the debtor's leverage, the debtor's performance history, the industry, *et cetera*). Even if the Debtors in the case at bar had credible and numerous examples of the secured loan interest rates obtained by other Chevron stations/convenience stores coming out of bankruptcy cases, or in the industry generally, these would not fairly take into account *debtor-specific criteria* which should be considered for purposes of Section 1129(b)(2). At the same time, this court does not consider the market rate all-controlling—if there were a ready market of lenders willing to make an exit loan to these Debtors

similar to what is proposed for Chevron by these Debtors. The
market would have to be *efficient* for it to be all controlling.
The market might, in fact, too highly assess the risk of (or
unfairly put a taint on) the debtors coming out of bankruptcy.
*Mirant*, 334 B.R. 822 and n. 71.

The question still remains, though, what is the appropriate
rate of interest in the case at bar—where there really proved,
without question, to be no efficient market for this risky of a
loan, other than perhaps a high wealth individual lender? This
court concludes it must fall back to the *Till* formula approach as
being the controlling test, since there appears to be no
"efficient market" of lenders willing to provide an exit loan
identical to what is being offered to Chevron here. The court
also concludes it should use the evidence presented in the case
at bar, of what the "closest thing to market" is (*i.e.,* prime
plus 4% to 5% if a lender got a first lien, and had credible
guarantees, and received a 10%+ down payment) as the best
guidance for what an appropriate risk adjustment factor would be
in this situation for Chevron. The court determines that an
interest rate in excess of 13% would be required for Chevron's
secured loans under the plan, since the evidence reflected that
13% is roughly what a special situation lender would expect
(*i.e.,* prime plus 5%) in this context *if* it had a first lien
position, credible guarantees and a substantial down payment.

-46-

Indeed, this is the interest rate the PTL lender proposed for its first lien $315,000 loan to the Debtors.  Taking all of this into account, the court will assume a 5.75% risk adjustment rate in this situation is appropriate since Chevron would be in an inferior lien position to PTL.  Thus, the court determines that a 13.75% interest rate is required under the Debtors' plan to provide Chevron's secured claim (amortized over 25 years, with a 7 year balloon feature) with a stream of payments, the present value of which equals the allowed amount of its claim.

However, the court observes one more problem with the Debtors' plan that creates an obstacle to confirmation.  Even if the Debtors changed the interest rate on the Chevron loans to 13.75%, Section 1129(b)(2)(A)(i)(I) requires that holders of secured claims "retain the liens securing such claims . . . to the extent of the allowed amount of such claims."  Here, the PTL Loan, with its negative amortization feature, would seem to work the result of impairing the Chevron liens (from the position they are now in) during the first several months of the plan.  Thus, even if the Debtors found a way to pay Chevron 13.75% interest, the court concludes that the Debtors would have to amend their plan to take out the negative amortization feature of the priming PTL Loan in order to comply with Section 1129(b)(2)(A)(i)(I).

## C.  Lack of Feasibility of the Current Joint Plan

Section 1129(a) of the Bankruptcy Code addresses the

multitude of requirements for plan confirmation under Chapter 11. This provision demands that "all of the [] requirement [be] met[.]" Similar to the other requirements for confirmation, feasability need only be proven by a preponderance of the evidence. *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th Cir. 1997); *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993).

The so called "feasibility" requirement of confirmation, found at Section 1129(a)(11), dictates that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor of the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

In the case at bar, even if the Debtors' projections were fully credible—which they were not—the Debtors' plan, using a 7% or 8% interest rate for the Chevron secured claims, was barely feasible. The Debtors' calculations and accounting methods used in their projections did not always make sense, and the Debtors were assuming things would happen that had not yet materialized, such as new tenants, rebates and credits, and improving sales. In any event, even if one accepts all of the Debtors' methodologies in toto, if one plugs in plan payments using a 13.75% interest

rate for Chevron, there is no prospect of feasibility since the Debtors' projections already showed very slim profits even using a 7% to 8% interest accrual on Chevron's loans. Thus, this would appear to be yet one more reason why there is no chance of a reorganization in prospect with these Debtors.

## D. Plan Classification Problems

The court makes one last observation that impacts whether these Debtors could ever have a confirmable plan in these cases. This court does not believe the Debtor CREIS could ever go to Section 1129(b) cram down without the support of Chevron and the taxing authorities (which it does not have), and that the Debtor NWTE would potentially have the same problem.

Specifically, the court believes there is a problem with the plan classification scheme in these cases that would likely preclude confirmation, even if the Debtors did not face the daunting obstacles of the insufficient interest rate being offered to Chevron and the feasibility problems.

Specifically, the plan has the following classes of creditors:

Class 1-secured tax claims;
Class 2-priority tax claims;
Class 3-Chevron secured claims;
Class 4-Balboa Capital secured claim;
Class 5-executory contract rejection claim of Burton Oil;
Class 6-unsecured claims greater than $10,000;
Class 7-unsecured claims less than $10,000.

Looking at the above classes, we know that Class 1 and Class

3 do not support the Plan. Furthermore, as earlier mentioned, Class 2 is an improperly created class that should not be counted for voting purposes. 11 U.S.C. §§ 1123(a)(1) and 507(a)(8). Additionally, the Class 5 executory contract claim of Burton Oil is improperly created/classified because not only was the Burton Oil contract a *postpetition* contract that the Debtors entered into with bankruptcy court approval during the cases (not an executory contract, the rejection of which would give rise to a prepetition unsecured claim), but the Current Joint Plan specifies that Burton Oil is waiving any "claim" and will enter into a new contract with the Debtors. Thus, the notion of there being any prepetition claim here to classify and on which to provide treatment is illusory. This leaves only Classes 4, 6, and 7. With regard to Classes 6 and 7, this court believes that separately classifying unsecured claims less than $10,000 from those over $10,000 (and paying those less than $10,000 a 30% distribution over time and those over $10,000 a 40% distribution over time) does not pass muster under Fifth Circuit authority, especially when there are only a handful of claims, and there is only one claim in each case besides Chevron's unsecured deficiency claim over $10,000. *See In re Greystone III Joint Venture*, 995 F.2d 1274 (5th Cir. 1991). This separate classification of Classes 6 and 7 has all the appearances of improper gerrymandering without any justification other than to

-50-

obtain an impaired accepting class for voting purposes (*i.e.,* Class 6—the unsecured claims of less than $10,000). 11 U.S.C. § 1129(a)(8) and (10). If Classes 6 and 7 were to be collapsed into one class, Chevron would, of course, dominate the voting results of the unsecured creditors, with a $600,000 deficiency claim in each case, and the Debtors would not have an impaired accepting class of unsecured creditors. Thus, that would simply leave Class 4 as the only possible impaired accepting class of creditors. With regard to Class 4, the court questioned earlier the notion of Citicorp/Balboa having a legitimate secured claim in the NWTE case. As referenced in footnote 4, *supra*, the only evidence the court has observed regarding the Citicorp/Balboa claim is Proof of Claim #17 in the NWTE case, in which Citicorp alleges a "Claim relating to the Debtor's possession of the equipment that Citicorp Leasing financed for Flash Mart Stores, Inc."—with no loan documents attached. Since no documents are in the record indicating why or how NWTE's has liability on this claim incurred by Flash Mart Stores, Inc., the court questions why this is a legitimate claim in the NWTE case. In any event, at best, Class 4 is a legitimate class *in the NWTE case but not in the CREIS case*.[36] Thus, the court sees no way that the Debtor CREIS could ever have a legitimate impaired accepting class of

---

[36] The court notes, once again, that these cases are not consolidated so there would have to be separate ballot tallies for each Debtor.

creditors to go to cram down, so long as Chevron and the taxing authorities are opposing its plan.

CONCLUSION

For all of the above reasons, Chevron is granted relief from the automatic stay in each the NWTE and CREIS case.  Orders will be issued consistent with this opinion.

###END OF MEMORANDUM OPINION###